UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------X
THOMAS J. TRIOLA,

                            Plaintiff,

        - against -

JOHN SNOW, SECRETARY OF THE
UNITED STATES TREASURY,

                            Defendant.
------------------------------------------------------X

Civil Action No.
CV-01-1603

(Irizarry, J.)


**DEFENDANT'S SUR-REPLY MEMORANDUM
OF LAW IN OPPOSITION TO PLAINTIFF'S
APPLICATION TO AMEND PRETRIAL
ORDER TO ADD SIX "REBUTTAL"
WITNESSES**


LORETTA E. LYNCH
United States Attorney
Eastern District of New York
Attorney for Defendant
610 Federal Plaza, 5th Floor
Central Islip, NY 11722-4454


VINCENT LIPARI
Assistant U.S. Attorney
    (Of Counsel)

**PRELIMINARY STATEMENT**

With leave of the court, pursuant to its November 23, 2010 docket entry order, defendant John Snow, Secretary of the Treasury of the United States (hereinafter,"Customs"), respectfully submits this sur-reply memorandum of law to further oppose plaintiff Thomas Triola's application to amend the pretrial order, dated July 10, 2006, to add six "rebuttal" witnesses. The proposed witnesses were, at the relevant time, Customs' agents who worked with Triola -- (1) Enrique Pecou; (2) Timothy Moynihan; (3) George Ma; (4) James McAndrew; (5) Kevin Smith; and (6) John Saladino.

**ARGUMENT**

**TRIOLA'S APPLICATION TO AMEND THE JOINT PRETRIAL ORDER MUST BE DENIED**

For the reasons set forth in Customs' prior brief, to which the court is respectfully referred, Triola's application to amend the joint pretrial order to add six rebuttal witnesses must be denied  because: (1) in the nine years that this action has been pending (discovery ended on September 19, 2002, more than eight years ago), Triola never identified five of the witnesses in either his automatic disclosure or in his responses to discovery demands, as required under Fed. R. Civ P. 26(e) (John Saladino, alone of the six, was identified); and (2) Triola never listed <u>any</u> of these witnesses in the four proposed Joint Pretrial Orders, which were submitted during the period October 13, 2004 to July 5, 2006, as required by section VI(a) of this court's individual rules.

In his reply submission, Triola again fails to submit a memorandum of law or to address Customs' legal authorities.  Rather, Triola submits an affidavit, sworn to February 4, 2010 ("Triola Aff."), which merely summarizes the anticipated testimony of the proposed rebuttal

witnesses and makes conclusory statements that the need for the testimony of these witnesses could not be anticipated until after Joseph King, Triola's former supervisor and the only alleged discriminating official, testified.  In fact, the Triola Aff. provides independent grounds to bar testimony by the proposed rebuttal witnesses because it makes clear that five of the six proposed rebuttal witnesses will be called to testify to claims of retaliation arising <u>after</u> November 1998. However, all such claims were dismissed by this court and the dismissal of those claims was affirmed on appeal.  The testimony of the sixth proposed rebuttal witness could have been anticipated before trial and thus there is no good cause for failing to list him in any of the Joint Pretrial Orders.

The claims remanded by the Second Circuit, and at issue upon resumption of the trial, are those claims of retaliation that arose <u>before</u> November 25, 1998, the date that King testified that he first learned of Triola's EEO activity.  <u>Triola v. Snow</u>, 289 Fed. Appx. 414, 417 (2d Cir. 2008) ("We therefore vacate and remand the portion of the district court's ruling addressing Mr. Triola's <u>pre-November 1998 retaliation claims</u> so that the district court may in the first instance consider whether Mr. Triola proved a causal connection between his protected activity and the adverse action, and whether retaliation played a motivating role in Mr. King's action") (emphasis added).  The Second Circuit otherwise affirmed this court's rulings and judgement in every other respect, including "rejection of Mr. Triola's retaliation claims <u>post-dating November 1998</u>." <u>Id.</u>, 289 Fed. Appx. 418 (emphasis added).

The post-November 1998 claims which were dismissed and are no longer at issue consist of the following alleged acts of retaliation: "[1] Mr. Triola's transfer to JFK Airport in 1999; [2] the denial of Mr. Triola's request to be transferred to RAIC/Long Island; [3] Mr. Triola's removal

from the PTI case in 1999; [4] retention of Mr. Triola's official personnel file and the resulting delay in his retirement; and [5] the detail assignments Mr. Triola received after November 1998." Id.

Because no post-November 1998 claims are at issue, the testimony, as summarized in the Triola Aff., by the following three proposed rebuttal witnesses is wholly irrelevant because it concerns Triola's transfer to JFK Airport in 1999 : (1) James McAndrew, who "can testify about the role that King can play in transferring a person who is at my level in 1999" (Triola Aff. ¶ 17 ); (2) Kevin Smith, who "can testify about my transfer to JFK Airport" (Triola Aff. ¶ 21 ); (3) Enrique Pecou who "was familiar with my work and can also testify about his issues with King and that he requested that he be transferred or that he would file an EEO complaint against King. I believe that King managed to make sure that Pecou was transferred" (Triola Aff. ¶ 23).[1]

Testimony by a fourth proposed witness, Timothy Moynihan, is also irrelevant because it concerns a post-1998 claim, Triola's removal from the PTI claim in 1999.  (Triola Aff. ¶¶ 7-8) ("Timothy Moynihan was not listed on prior documents because there was no way to anticipate that King was going to testify that Moynihan was assigned to the Platinum Technology International (PTI) case . . . . It is anticipated that Moynihan will testify that he was never assigned to the PTI case"); see, Decision, exhibit A, 19-20 (holding that, after Triola's transfer to JFK Airport, temporary assignment of  PTI case to Moynihan, and then back to Triola was not retaliatory).

---

[1]     Apart from the fact that Triola's transfer to JFK in 1999 and is no longer at issue, the court, in any event, found that "[Acting Special Agent In Charge of the New York Office Marvin] Walker's testimony at trial made clear that it was Walker and not King who was responsible for the decision to transfer plaintiff to JFK and the plaintiff was transferred to that office because of an existing vacancy in that office." Decision, dated August 24, 2006, at 18 (relevant pages annexed as exhibit A). The court further found that "[i]t is uncontroverted that Mr. King had no power or authority to transfer Mr. Triola anywhere . . . . the court finds Mr. Triola's testimony that he was unaware of this hierarchy of transferring authority incredible in light of his years of experience with Customs and other federal agencies." Id. at 8.

Triola seeks to introduce testimony by a fifth proposed rebuttal witness, Robert Saladino, King's supervisor, to refute King's claim as to when King had discussions with Saladino about King's unhappiness with Triola's performance.  However, any testimony by Saladino is irrelevant because Saladino did not become  King's supervisor before April 1999 (Triola Aff. ¶ 13), i.e., a time after November 1998 and thus no longer at issue.  Triola contends, however, that he could not anticipate that King would testify at trial "about [King] giving him a poor review at some point in 1998" (Triola Aff. ¶ 10), which could not be correct because it was before Saladino became King's supervisor in April 1999 (Triola Aff. ¶ 13).  The significance of this contention is far from clear.  In any event King did not say at trial that he discussed Triola's performance with Saladino at some point in 1998.  Rather, when asked when his group was first supervised by Saladino, King testified at trial that he could not be certain: "I would say 1999, the latter part of 1998, the beginning of 1999, something like that . . . . again I don't know the exact dates.  This is from memory.  I have no records whatsoever." See exhibit B hereto, at 334.  The only testimony in the record concerning discussion by King and Saladino concerning unhappiness with Triola's performance before 1999 was King's deposition testimony read into the record at trial by Triola's attorney.  See exhibit B hereto, at 334 (""In the latter part of 1998, say the summer, I had discussions [with Saladino] about giving him [Triola] a performance improvement plan which as I understood it would be the initial beginnings of what could lead to a less than satisfactory rating").  The fact that Triola's attorney read this prior testimony given by King in a pretrial deposition into the record at trial wholly undermines, and makes ludicrous, Triola's contention that "I could not anticipate that King would try to assert that he spoke with Saladino about giving me a poor review prior to April 1999" (Triola Aff. ¶ 13).

Finally, Triola contends that the sixth proposed witness, George Ma, "can discuss the circumstances concerning King's transferring of [Triola's] assignments and duties at the U.S. Secret Service Electronic Crimes Task Force to him.  Prior to trial, it was not possible to anticipate the position that the defendant would take regarding the transfer of assignments." (Triola Aff. ¶¶ 19-20). Triola does not provide, and cannot provide, any explanation for why he could not anticipate this testimony.  In fact, in ¶¶ 2(a) and (b) of King's EEO affidavit, dated December 14, 1998 ( introduced at trial as plaintiff's exhibit 17 [annexed as exhibit C hereto]), King discussed his unhappiness with Triola's performance in general, the reasons for his removal from the Electronics Task Force and the fact that, upon Triola's removal, Ma was assigned to the Electronics Crime Task Force.  Thus, there is no basis to Triola's testimony that he could not anticipate any of these matters before King testified at trial and thus should be permitted to call Ma as a rebuttal witness.

Based on the foregoing, and the legal authorities and reasons set forth in Customs' prior brief, to which Triola has never responded, Triola's motion to amend the pretrial order, dated July 10, 2006, to add six "rebuttal" witnesses who were never identified in discovery or listed in any of the four prior joint pretrial orders must be denied.

## CONCLUSION

For the foregoing reasons, the court should deny Triola's application to amend the

Joint Pretrial Order to permit six new witnesses to testify on rebuttal.

Dated: Central Islip, New York
      December 6, 2010

<div style="margin-left:40%">

LORETTA E. LYNCH
United States Attorney
Eastern District of New York
610 Federal Plaza, 5th Flr.
Central Islip, New York 11722

By:    S/VINCENT LIPARI
       VINCENT LIPARI
       Assistant U.S. Attorney

</div>

To:    Gabor & Gabor
       Attorneys for Plaintiff
       400 Garden City Plaza, Suite 406
       Garden City, NY 11530
       (516)248-2525

# EXHIBIT A

1

1   UNITED STATES DISTRICT COURT
    EASTERN DISTRICT OF NEW YORK
2   -------------------------------x
3   THOMAS TRIOLA,
                    Plaintiff,
4           versus                    01 CV 1603
5   SNOW,
                    Defendant.        United States Courthouse
6                                     Brooklyn, New York
    -------------------------------x
7
                                      August 24, 2006
8                                     4:30 p.m.
9               TRANSCRIPT OF TRIAL
10  Before:     HON. DORA L. IRIZARRY,  District Judge
11                      APPEARANCES
12  Attorneys for Plaintiff:
13
    LAWRENCE SOLOTOFF, ESQ
14
15
16  Attorney for Defendant:
17
        ROSLYNN R. MAUSKOPF
18      United States Attorney
        BY:  VINCENT LIPARI, ESQ.
19      Assistant United States Attorney
        One Pierrepont Plaza
20      Brooklyn, New York 11201
21
    Allan R. Sherman, CSR, RPR
22  225 Cadman Plaza East
    Brooklyn, New York  11201
23  Tel: (718) 260-2529  Fax: (718) 254-7237
24
25  Proceedings recorded by mechanical stenography, transcript
    produced by computer.

8

Decision

1   he had worked there before and was not working out in his

2   group, plaintiff lived in Long Island and the commute would be

3   much shorter for Mr. Triola.

4          Mr. King testified that he told Mr. Triola that he

5   could do whatever he could to assist Mr. Triola in this

6   transfer.  Mr. King further testified that he had spoken to

7   supervisors of two other groups that did financial

8   investigations but they would not take Mr. Triola.

9          It is uncontroverted that Mr. King had no power or

10  authority to transfer Mr. Triola anywhere.  The deposition

11  testimony of Special Agent Victoria M. Ovis, Associate Special

12  Agent In Charge for New York City, Mr. King's supervisor,

13  establishes that as a second line supervisor, she only had the

14  authority to transfer someone within her division.  A third

15  line supervisor could transfer within the office and only a

16  special agent in charge could make a transfer outside of the

17  office.  This testimony was corroborated by Special Agent

18  Walker and by Mr. King.

19         The Court finds Mr. Triola's testimony that he was

20  unaware of this hierarchy of transferring authority incredible

21  in light of his years of experience with Customs and other

22  federal agencies.

23         Mr. King testified that at some point in late 1998

24  or early 1999 when Mr. Saladino became the associate special

25  agent in charge of Mr. King's division, he was asked to report

<div style="text-align: right;">18</div>

Decision

1   transfer to the JFK office was a materially adverse action.

2   Further, Walker's testimony at trial made clear that it was

3   Walker and not King who was responsible for the decision to

4   transfer plaintiff to JFK and that plaintiff was transferred

5   to that office because of an existing vacancy in that office.

6   Walker testified that he knew Triola at JFK, he would be under

7   his supervision and that he was sensitive to his plight.

8            Moreover Walker made it clear that had Mr. Triola

9   asked him for a transfer to the Long Island office, he either

10  would have transferred him right away or after a transitory

11  period of JFK.

12           Triola never asked Walker for the transfer.  Thus,

13  plaintiff has also failed to establish a causal connection

14  between his EEO activities and Walker's decision to transfer

15  plaintiff to JFK.

16           This claim is therefore dismissed.

17           Regarding his second retaliation claim, Triola

18  testified that at the time of his transfer to the JFK office,

19  King removed Mr. Triola from a high profile and highly

20  successful case known as the Platinum Technology case or PTI

21  case and had the case closed.

22           Plaintiff asserts that his removal from the case and

23  its closure were retaliatory and points to the subsequent

24  reopening of the case and his reassignment to it by another

25  supervisor as evidence of King's retaliatory intent.

19

### Decision

1    Plaintiff's assertions standing alone are enough to

2   establish a prima facie case of retaliation since plaintiff's

3   removal from a prestigious assignment may be characterized as

4   a materially adverse action and plaintiff's subsequent

5   reassignment would demonstrate a causal connection between

6   plaintiff's EEO activities and his removal from the case.

7   Following the framework set forth in McDonnell-Douglas

8   Corporation versus Green, 411 U.S. 792, 93 Supreme Court

9   Reports, 1817, 1973, once the plaintiff has made out a prima

10  facie case of retaliation, the defendant then has the burden

11  of pointing to evidence that there was a legitimate

12  non-retaliatory reason for the challenged action.  If the

13  defendant meets the burden, the plaintiff must then

14  demonstrate that there is sufficient evidence upon which the

15  Court could find the proper legitimate reason merely a pretext

16  for impermissible retaliation.  Gallagher versus Delaney, 139

17  F.3d, 338, at 349, Second Circuit 1998.

18    Here King testified that the Platinum Technology

19  case belonged his group in the World Trade Center office.

20  Mr. Triola's transfer to the JFK office and thus to another

21  group necessitated the assignment of a different agent in

22  King's group.  When Mr. Triola's new supervisor, Agent Walker,

23  contacted King to have Triola reassigned, King complied by

24  closing out the case in the World Trade Center office thereby

25  allowing it to be reopened under the auspices of the JFK

Decision

1    office and allowing for Triola's reassignment.

2         Plaintiff failed to rebut this testimony and has

3    therefore failed to show that the defendant's proffered

4    non-retaliatory explanation for removing plaintiff from the

5    Platinum Technology case was pretextural.

6         Accordingly, this Court finds that plaintiff's

7    removal from the case was not retaliatory.

8         This claim is dismissed.

9         Plaintiff's third remaining claim concerns Smith's

10   retention of plaintiff's office personnel folder or OPF

11   resulting in plaintiff's significantly delayed retirement.

12   Specifically Mr. Triola testified that on September 23, 1999

13   he met with a U.S. Customs attorney Todd Smith to discuss a

14   possible settlement involving plaintiff's three EEO

15   complaints.  Plaintiff stated that Smith offered to grant

16   Mr. Triola's request for a transfer to the Long Island office

17   if Mr. Triola withdrew all three of his EEO complaints.

18   Plaintiff contends that his refusal to do so motivated Smith's

19   decision to withhold Mr. Triola's OPF purposely delaying his

20   retirement.

21        Mr. Triola has failed to show that Smith was even

22   aware of Mr. Triola's retirement plans and has therefore

23   failed to establish a causal connection between Smith's

24   actions and Mr. Triola's EEO complaints.  Even assuming a

25   causal connection and prima facie case of retaliation,

EXHIBIT B

King/Cross/Solotoff

Page 333

1    A    No.

2    Q    You said you had meetings with Mr. Triola.

3         Did you keep notes about those individual meetings

4    you had with him specifically concerning his performance?

5    A    His performance notes, I would have kept, yes.

6    Q    I draw your attention to page 15 of the transcript lines

7    16 through 18.

8         Line 16 through 18.

9         "Question:  Did you keep notes about the

10   individual's performance in your group?

11        "Answer:  No.

12        When you gave this statement, you knew that to be

13   the truth, correct?

14   A    Did I keep notes about the individual performance?  No,

15   because those are computerized records.  In theory, I could go

16   back and pull up Triola's work for the last three years on the

17   computer.  I didn't need to keep those notes.  Notes I would

18   keep giving him a PIP if that would be the case.  If that

19   would be the case, I would have kept notes for that because I

20   would have been required to do that.

21   Q    Did you make written note about comments about how an

22   employee was doing in regard to Mr. Triola?

23   A    No.

24   Q    When did you -- when was your group under the chain of

25   command of Mr. Saladino?

ALLAN R. SHERMAN, CSR, RPR  Official Court Reporter
United States District Court  Eastern District of New York

King/Cross/Solotoff

Page 334

1    A    Again, I would say 1999, the latter part of '98, the

2    beginning of '99, something like that, he was transferred in

3    from Kennedy Airport to be the ASAC for my division.

4    Q    Isn't it true that he did not come into -- your group did

5    not come under his chain of command until April of 1999, isn't

6    that true?

7    A    Again, I don't know the exact dates.  This is from

8    memory.  I have no records whatsoever.

9    Q    I draw your attention to transcript page 13 line 9

10   through 19.

11   A    I'm sorry, what page?

12   Q    Page 13.

13   A    What line?

14   Q    One second.

15        Line 9.

16        "Question:  Could you just describe that to me in

17   your own words.

18        And what you were referring to was ratings that was

19   defined in the question above but your answer was as follows:

20        In the latter part of 1998, say the summer, I had

21   discussions about giving him a performance improvement plan

22   which as I understood it be would the initial beginnings of

23   what could lead to a less than satisfactory rating.

24        "Question:  Who did you have those discussions with?

25        "Answer:  John Saladino, who is the ASAIC next level

King/Cross/Solotoff

Page 335

1   up.

2           In fact, Mr. King, you did not have those

3   discussions in 1998, isn't that true?

4   A   I had discussions with him.  Again, the date, I don't

5   remember.

6   Q   You were mistaken when you said this when you were under

7   oath?

8           MR. LIPARI:   Objection.

9           THE COURT:   Sustained.

10  Q   Who initiated the process, is that the discussions with

11  Mr. Saladino?

12  A   He did.

13  Q   What in fact happened with Mr. Triola's performance after

14  you had those discussions with Mr. Saladino?

15  A   I'm not sure I understand that.

16  Q   Did Mr. -- what was Mr. Triola's performance following

17  your discussion with Mr. Saladino, did it change in any way?

18  A   No.

19  Q   Did you prepare a performance improvement plan for

20  Mr. Triola?

21  A   No.

22  Q   You prepared employee proficiency plans with Mr. Triola

23  each year, the performance management program on an annual

24  basis?

25  A   There was an annual appraisal based on a pass fail

# EXHIBIT C

A564

UNITED STATES GOVERNMENT

## *Memorandum*

DEPARTMENT OF THE TREASURY

UNITED STATES CUSTOMS SERVICE



(98-0573) SLD

Date: REC'D

DEC 1 4 1998

DEC 1 - 1998

DEPARTM. ...
REGIONAL COMPLAINTS CE... ...PORT
CHICAGO, ILLINOIS

To:     Lisa Culpepper,
        EEO Specialist

From:   Office of Associate Chief Counsel, New York

Subject: <u>Transmittal of Affidavit</u>

    As requested by the EEO Investigator, please find enclosed
herewith the original affidavit of Joseph F. King in regard to
the complaint of Thomas J. Triola, TD Case Number 98-3289.

    If you should have any questions in regard to this matter,
please do not hesitate to contact Steven L. D'Alessandro of my
staff at (212) 466-4562.

JUDITH L. ALTMAN

Enclosure

PLAINTIFF'S
EXHIBIT
17

**ATTORNEY WORK PRODUCT / PRIVILEGED COMMUNICATION CIRCULATION RESTRICTED**
This document contains attorney work product or privileged attorney/client communications.  It is not available for release,
disclosure, or use outside of Customs without the express prior approval of the Associate Chief Counsel's Office, (212) 466-4562.

A565

AFFIDAVIT OF JOSEPH F. KING



STATE OF NEW YORK    )
                     ): ss.
COUNTY OF NEW YORK   )

I, JOSEPH F. KING, employed by the United States Customs Service
as the Strategic Group Supervisor (GS-1811-14) located at 6 World
Trade Center, New York, New York state:

1.   Thomas Triola and I are both employed as Special Agents of
     the United States Customs Service.  As such, I have known
     him for approximately nine (9) years and I have been his
     supervisor for approximately two (2) or three (3) years.

2.   The term "high profile" has not been defined.  Nevertheless,
     in regard to the ordinary meaning of this phrase, I respond
     as follows:

     (A)  1.   Multiple cases were reassigned from Mr. Triola.  I
               do not know to which one he is referring.
               Regardless, none of the cases that were reassigned
               from him were high profile.
          2.   In my opinion as his supervisor, Mr. Triola failed
               to maintain and manage the cases correctly.
          3.   I do not understand this question.  The cases were
               reassigned to the agents who were available,
               Special Agents George Ma and Timothy Moynihan.
               Mr. Triola was assigned to other duties and cases.
          4.   See answer to question 2(A)(3) above.  The cases
               were reassigned to Special Agents George Ma and
               Timothy Moynihan.
          5.   In my opinion, Mr. Triola did not have any high
               profile cases.

     (B)  1.   The function of the United States Secret Service
               Electronic Crime Task Force ("task force"), is to
               investigate a variety of federal and state crimes
               dealing with electronic communications, etc.
          2.   Mr. Triola was removed from the task force after
               the Secret Service supervisor informed me that he
               was not working out both in the undercover
               operation and as the Customs liaison.

Page __1__ of __1__ pages.                    Deponent's Initials _JFK_

PG 219

A566

3. His role in the task force was reassigned to new agents and he was assigned to other duties and cases.

4. See answer to question 2(A)(3) above. The task force case was originally reassigned to Special Agent George Ma. After his transfer to the Narcotics Group, the task force case was reassigned to Special Agent Timothy Moynihan.

5. See answer to question 2(A)(5), Mr. Triola did not have any high profile cases.

(C)  1. I had a discussion with Mr. Triola about his lack of any independent development of informants, sources of information, arrests, indictments or convictions. Mr. Triola stated that his "real love" was not strategic cases, but financial cases. He claimed to have done all the things an agent at his level is supposed to do within financial groups. I replied that if he is not able to perform in this group, he can put in a memo to request to go to a financial group. Furthermore, since he lives on Long Island, I also suggested that he might want to request JFK International Airport ("JFK"), because it would be a shorter commute and he had previously worked there.

2. See answer to (C)(1) above. After Mr. Triola informed me of his interest in financial matters and a recent statement by the Special Agent in Charge (New York) ("SAIC(NY)") about possible transfers, I suggested that he ask to go to a financial group. Since he lives on Long Island, I also suggested that he ask to go to JFK because of his commute.

3. I believe that Mr. Triola put in a memo, but I do not remember nor do I have a copy.

4. No.

5. Yes. If an agent was not productive in this group, I would encourage them to transfer to a group in which they would be happier.

(D)  I deny making any "intimidating or degrading comments" to Mr. Triola during the previously accounted discussion. After a meeting with the SAIC(NY) about his concerns for accountability of agents and their

Page 2 of 5 pages.          PG 220          Deponent's Initials

A567

supervisors, I had several conversations with Mr.
Triola about his lack of production, his failure to
properly maintain relationships with the United States
Attorney's Offices and the Nassau County District
Attorney's Office and his overall lack of getting the
job done. He was one of several other agents that I
spoke to about the lack of production.

(E) 1. Mr. Triola brought me the form to be filled out.
We went over it together. He had the instructions
and he told me which questions to answer on the
form. It was completed and immediately returned
to him. I then told him that he should review it
before faxing or mailing it.

Later that same day, another Special Agent gave me
the same form to complete. It was filled out in
the same manner as Mr. Triola's. However, unlike
Mr. Triola, that Special Agent informed me of
additional questions which required completion. I
called Mr. Triola to inform him of this, but he
was already gone for the day.

On the following morning, I spoke to Mr. Triola to
inform him of the additional questions which
required completion. Unfortunately, he told me
that he had already sent out the application.
Nevertheless, I told him that he should contact
Personnel and explain to them what had happened.
In the meantime, I told Mr. Triola to give me all
the forms and I would complete them. Mr. Triola
gave me the forms and I completed them
immediately.

Later, Mr. Triola informed me that he had spoken
to Personnel, but they would not accept a second
submission. I told him to get me the name of the
Unit Chief in Personnel and I would speak to them
personally. He gave me the name of someone to
speak to, but that person was not available that
day.

I spoke to Personnel the following day. Although
I tried to get them to accept a second submission,
I was told that they would not accept it. I was

told that it is the applicant's responsibility to make sure that their package is complete and correct.

2. No.

3. See answer to question 2(E)(1) above. Yes, the questions were completed.

4. I do not know, I was not involved in making selections for that announcement.

(F) 1. The scores given to Mr. Triola reflected his performance during the period. Previously, Mr. Triola worked on Operation Cleansweep, which was run by another Grade 13 Special Agent. However, when that operation subsided, Mr. Triola was expected to perform in accordance with his Position Description. Mr. Triola's performance did not measure up to his Position Description.

2. I do not have copies of the documents that are the subject of Mr. Triola's allegations. As such, I am unable to answer this question with particularity. Mr. Triola received appropriate scores which reflected his observed performance.

3. I do not know. I have no direct knowledge of the procedures followed by Personnel in the creation of a BQ list.

4. See answer to question 2(F)(3) above. I do not know.

5. See answer to question 2(F)(3) above. I do not know.

(G) See answer to question 2(E)(1) above. Yes, I did speak to someone in Personnel. I do not recall the name of that person.

(H) There were others who applied for that announcement, but I do not remember their names.

(I) Mr. Triola was the first person to bring his package to me. After the other agent brought the additional questions to my attention, I informed Mr. Triola as well as everyone else to make sure that their application packages were complete.

(J) I do not have copies of the documents that are the subject of this question. As such, I am unable to

A569

answer this question with particularity.  All of the
scores appropriately reflected the observed performance
of the applicant.

(K)   No.  Mr. Triola was not treated differently.

(L)   This question is unclear.  If the "similar situation"
referred to involves Mr. Triola's incomplete
application, I have no direct knowledge of what
management has done.

(M)   No.  For the record, I had no knowledge of Mr. Triola's
complaint until I was contacted by EEO Investigator
William Troupe on November 25, 1998.  After that, I was
informed by Mr. Triola that he filed an age
discrimination complaint.


I have read the above statement, consisting of ___5___ pages, and
it is true and complete to the best of my knowledge and belief.
I understand that the information I have given is not to be
considered confidential and that it may be shown to the
interested parties.

_____
Deponent's Signature


Subscribed and (sworn to) (affirmed)

before me at _____

on this __14th__ day of _____ 19_98_    _____
                                            Notary Public


JUDITH L. ALTMAN
Notary Public, State of New York
No. 30-4922664
Qualified in Nassau County
Term Expires February 16, 19__


Page __5__ of __5__ pages.        PG 223        Deponent's Initials _____